one two two zero six Michael Riolo versus the United States and Mr. DiMaggio is that the right way to pronounce it? Okay, you're on. Let me just say with regards to masks if you are at the podium and you feel comfortable taking off your mask that's perfectly fine if you prefer to leave the mask on that is fine too. Yes, you can. May I please the court morning? Good morning. I'm Brian DiMaggio. I'm here on behalf of the appellant Michael Riolo in this cause. This case is now before this court on its third round here on Mr. Riolo's section 2255 motion. This time following the evidentiary hearing that we fought about eight years to get at the conclusion of that hearing the district judge found that Mr. Riolo did not receive ineffective assistance of counsel and that his plea was knowingly low. Now one of the most important duties a criminal defense lawyer has as it relates to representing a client is to advise his client about whether or not it would be prudent to enter a plea and the facts and circumstances and consequences of doing so. You know after all the Supreme Court recognized a little less than ten years ago in Missouri versus Fry about 97% of federal convictions and via a plea and 94% of state convictions in that way. So plea offers are more the rule than they are the exception and that's how most cases get resolved. Now when an attorney is advising his client as to the relevant consequences of entering a plea it is paramount that he apprise the client about his exposure under the sentencing guidelines. That is a necessary part of that advice and that comes from the Herrera opinion from the Fifth Circuit that we cite in our briefs. Now let me ask you a question. Let me sort of lay out this scenario for you and have you respond to it in the time allotted. So except that Ms. Van Vliet provided incorrect information or at least misleading information to Mr. Riolo about the agreement that she had with the government about the advisory guidelines, okay? But by the time of the plea hearing it's undisputed that although her chronology as you point out may be off, Mr. Riolo had reviewed the plea agreement with her at some point and at the change of plea hearing the district court explained to Mr. Riolo that the probation officer was going to prepare a pre-sentence investigation report, that it, the court was going to review it, that the parties would get to object and at the end of the day the court was going to decide what the guidelines were and that nothing that the lawyers told Mr. Riolo was binding on the court itself. Mr. Riolo said under oath that he understood all of that. So given that, how can you prevail? I have three things to say about that, Judge The fact that it wasn't reduced to writing in the actual plea agreement is the basis of Mr. Riolo's claim that this case fits the paradigm of Bettencourt v. Willis, the 1987 decision from this court, which is there was an important premise that was offered to the defendant in order to get him to plead guilty. In that case it was a sentence reduction agreement. In this case it was a certain offense level and it wasn't reduced to writing. Now that defendant in Bettencourt v. Willis sat through the plea colloquy too, sat through the plea proceeding and nobody said boo about it at the time and the court still found that his lawyer was ineffective for failing to reduce that to writing. The second thing I would say about your hypothetical is... It's not a hypothetical. Those are the facts in this case that Ms. Van... I accept from your perspective for the purpose of my question that Ms. Van Bleet gave incorrect or misleading advice to him that there was an agreement between the parties as to the advisory guidelines, but by the time that he pled guilty she had gone over the plea agreement. The plea agreement did not contain any such agreement and the district court explained to him what I went over. So it's not a hypothetical. And I'm sorry I characterized that. My response to your question, my second response to your question in addition to the Bettencourt argument, my second response is this. It's one thing when a lawyer misadvises a client as to his exposure under the guidelines, but this case is a little rare because what we have in this case is we actually have not only a verbal confirmation from his lawyer that the government had the same calculations and agreed to that, but we also have that in writing and nobody's disputing that. That's a very important undisputed fact here and this is what I would say about that is yeah, the court may have said we're going to advise you or we're going to reach our own calculations, but if you're the defendant, if you're Mr. Riolo, put aside his own lawyer's misadvice. If he's hearing from the government that this is what's going to be the offense level in your case and this is what your exposure is, who's going to try to advocate for a higher offense level and give you more time than the United States government? They're the very body prosecuting him. They're the ones that want to see him do the most time. And I think that's very important to consider here that not only he got the misadvice from his lawyer, but he did hear it through the lens of what the government said and the government after all is the one who's trying to lock him up. So how would he ever envision that the court or the probation office would have something that would exceed what the government wanted to do? But didn't they discuss according to Mr. Riolo's wife's testimony, didn't they discuss the possibility of what would happen if the judge went beyond the party's agreement? They discussed that possibility, did they not? They did and the testimony was that there would be an appeal and that they would be successful if they appealed it, if the court went beyond that, that there would be a reason to challenge that. But so he understood that the party's agreement was no guarantee that he would receive that sentence, right? That's see, now that's where you're into a factual dispute. Their side of that is, no, that's not how we viewed it. That's not how we heard it. We heard it, which was, look, if he goes above it, it's fine. We're going to appeal it. It'll be fine. We'll get the what the agreement says. And a lot about what the agreement says is the third thing I'd say about your question is the lawyer says, okay, well, he knew about all this because I went through the agreement line by line with him. Well, it turns out that's just totally factually false because she didn't have the agreement to go line by line. But she went over it at some point. They discussed it at some point before the change of plea hearing, did they not? I thought that was undisputed. Her chronology is off, but they went over it at some point, right, before the change of plea hearing. The testimony is that the one time she went through the agreement line by line would have been at the May 7 meeting where she didn't have the agreement. Other than that, there are some time records in the billing where they No, but what did Mr. Riolo say? He said that he had read the agreement, okay, but he didn't say that he went through it line by line with her. And I understand the court's question, but that's why I go back to the Bettencourt thing. It wasn't in there, and I don't think we can hold it against him because it wasn't held against the defendant in Bettencourt. Because it wasn't put in writing. It wasn't put in writing, correct, correct. And that's the facts of Bettencourt. I mean, it's on the proceeding. The lawyer didn't say anything about it. The defendant didn't say, hey, I thought this was going on. In fact, the judge didn't even remember the agreement in Bettencourt, and the court still found they were ineffective. What about the factual finding partly made on credibility grounds that Ms. Van Bleet did not tell Mr. Riolo that probation would not be involved? I know that's a double negative, but he claimed that he generally, that he did not know the involvement of probation. He thought the party's agreement was going to take care of everything. She testified that her practice generally is to tell people about her clients, about the involvement of the probation office. And the district court found her testimony and that score credible. What do you do with that credibility, partially credibility finding? I don't think the court needs to accept that for two reasons. Number one, she says that I gave him that advice at this meeting where I went through the plea agreement where she didn't have it. The second place that that comes up is that, oh, I told him about this when I was sitting down at this meeting with the investigator, Mr. McManus, where when you go back and look at the timeline as it relates to the testimony and the time records, she was out of town at the time. She wasn't even present at the meeting. This case, Mr. Riolo got punished in large part on the credibility findings here due to the quote passage of time, which candidly was not Mr. Riolo's fault. And I think what one could look at is if you go look at the documents that were contemporaneously generated in this case, they tell the true story of what was actually going on here and they support Mr. Riolo's claim. I want to say one other thing about the fact. Before you move on, I read the transcript of the plea colloquy a couple of times. And part of the difficulty with the argument you're making, at least speaking for myself, is that it runs smack into a transcript which suggests something different. And I want to read you just one brief passage of what was a very detailed allocution at the plea. The judge says to your client, who's under oath, question, has anyone made any promises or representations to you as to what sentence I will impose in this case? He says no. He doesn't say, well, they gave me reason to believe that it would be capped at a guideline range of a cap of 30 in the guidelines, which was 97 to 121 months. He doesn't say word one about that. He said no one made any promises or representations as to what the sentence would be that the court would impose. Question, he doesn't stop there. The judge, has anyone made any promises or representations to you other than what's contained in the plea agreement that you signed? Answer, no. He doesn't say, well, sort of, kind of, maybe. They led me to believe that it would be 97 to 121 months, and that was a big deal to me. And I know that you may not be bound by it, but they gave me every reason to think that you would follow it. Doesn't say anything. Answer, no. Third question, has anyone made any promises or representations to you other than what's in the plea agreement in order to convince you to plead guilty in this case? Any other promise, any other representation other than what's in the plea agreement, which he signed, in order to convince you to plead guilty? Answer, no. How are we to handle what your client said under oath, and there was sufficient colloquy so that it was clear that your client was perfectly lucid at the time. He wasn't on any medication or drugs that might have impaired his ability to understand. No promises, he said. Nothing beyond the plea agreement. How do we handle that? Well, first off, there's several cases from this court that say that the statements that are made during a Rule 11 colloquy can be overcome. Now, I admit that it discusses that. That's in our paper. So, those statements can be overcome. Number two, I go back to the Bettencourt v. Willis case. Presumably, when they gave Mr. Bettencourt the Rule 11 colloquy, they asked it. I've never been in federal court where a plea was made where these kind of questions weren't asked. In state court, you may get a quicker plea colloquy, but they're always asked, and it wasn't— See, but kind of the problem here is it wasn't asked just once. It wasn't asked just twice. It was asked and answered on multiple occasions, and it was asked in a variety of different ways. The judge really genuinely was trying to find out whether there was something else going on here, whether someone leaned on him in some way or in some other way, and the judge wanted to know it and disabuse him of the notion that the judge was in any way bound. So, I don't dispute that there are circumstances where you can overcome a plea allocution. It isn't easy, as you rightly point out, and I don't see anything here that would us to discard what your client said under oath. Number one, Mr. Riolo's testimony was—you'd mention, is there an untoward promise or anything like that? His testimony was, I heard that admonition from the court is—actually asked me, did any unseemly promises happen? Something—that was the term he used. Of course, the question wasn't unseemly. It said, question, has anyone made any promises or representations to you as what this—what sentence I will impose in this case? It wasn't untoward. It was any promise, which means the universe of possible promises. And that's why I go back to the fact that not only did his lawyer misadvise him here, but he also heard from his lawyer and saw in writing from his lawyer that the government agreed to this, and I would say that is a unique circumstance here that, you know, the party— seems to me that you have, and Judge Jordan began to explore it with you, and you can help me with it—is that the district court, the trial court, believed Ms. Van Vliet and rejected, where there was a critical conflict, the testimony of your client and the other witnesses. There were two recollection serves me right. So you not only have to overcome what he said under oath in response to really clear and detailed questions, but you have to overcome a square credibility choice made by the trier of fact, and maybe if I were there and I heard it, I might have come up with a different conclusion, but we're bound, unless you can show us, that the credibility choices were clearly erroneous. And we—and I see I'm over time, but if I may— No, but you're answering my question. We tried to show that in our brief, that a lot of what she said and what the judge credited was improbable or impossible testimony, such as her saying, I had the plea agreement and went out. She didn't have it at the time. It was improbable and impossible, but let me say one more thing. Even if you accept everything she said is true, there's a factual finding in there on page 27, and this is kind of unrelated to the ineffective assistance claim, where the judge says, I've reached the following conclusion. The petitioner, and he goes to the petitioner's wife and Mr. Houston, misunderstood what Ms. Van Bleet told them about the sentencing process, and I asked the court this. If there's a factual finding in the record that Mr. Riolo misunderstood what was going on, then how is his plea knowingly entered? It would have to be unknowing if he ended on that and get back up and rebuttal, but if we're going to accept factual findings, I think that's one that, if he run out all the way, his plea would have to be unknowing. Thank you. Thank you very much. You've saved your full time for rebuttal, Mr. DiMaggio. Ms. Galler. May it please the court. Good morning. Morning. This case is about credibility, and the district court has, after having an evidentiary hearing, listened to all of the parties and made findings, factual findings, heavily based on credibility in many cases, that favored Ms. Van Bleet's testimony over Riolo's claims. That means that those factual findings were exceedingly improbable, and he simply is not able to do that. A few things that I think are very important to point out for the court related to that is, let's talk about the plea agreement and when that was discussed. As your honors pointed out, there really is not a challenge that at some point Ms. Van Bleet went over the plea agreement in detail with the defendant. He testifies to that in his change of plea colloquy that he did go over fully and completely the entire plea agreement with his attorney. His testimony at the evidentiary hearing is not as clear, right? I think certainly his position now is trying to hedge that. No, not legal position. I'm not Riolo's own testimony at the evidentiary hearing when he testified in rebuttal. It wasn't all that clear as to when Ms. Van Bleet went over the plea agreement with him, right? The timing as far as when that happened in the record is very unclear, and I think it's also important for this court to recognize that the district's court, the district court's factual findings were not tied to timing because that was very disputed as far as what happened when. But I think what the district court rightly focused on was what was the substance of the information that was communicated. It doesn't really matter whether it happened on May 7th or May 11th. What matters is did it happen before he pled guilty, and there is a billing record to alleviate any concern that the plea agreement was discussed. Ms. Van Bleet has a billing entry from May 19th showing that she went over the plea agreement with the defendant. So I think that that should give some illumination and support to the district court's findings supporting her testimony that she did in fact go over this information with Mr. Riolo. What's your response to Mr. Riolo's argument that he understood the plea colloquy in the context of whether the district court would give him the low end of what he thought was the guidelines range as opposed to the high end? Well, his perceptions, what he's saying he perceived the plea colloquy to be about, but the question before that is, well, what was he informed of before the plea, right? And the district court made clear factual findings that his attorney had advised him all about the guidelines and that the probation office would conduct an investigation and be making a determination as what those guidelines would be. So his claim that he perceived it to be in some way that was only limiting the judge within the guideline range, it's not consistent with the information that his attorney had been provided. Well, it would be consistent with the email that Ms. Van Bleet sent saying that the government's calculations are the same as ours, wouldn't it? That email saying that the calculations were, that the government's calculations match ours, that's what, you know, if we look at the text of what that means, that it says what it means, that the government and the defense both had estimated a particular guideline range, but that does not mean that that's going to be the court's guideline range. And she explained that to him according to her testimony, which the district court found to be credible. And that's something that was also gone over by the court directly with Mr. Riolo during the plea colloquy, that the, whatever guidelines that the attorneys may have advised are not necessarily correct and the court may not agree with those guidelines. So that all is laid out in the plea colloquy as well. Counsel, let me ask you a different question. One of the arguments that Mr. DiMaggio makes is that defense counsel misadvised and miscalculated Mr. Riolo's sentencing guideline range by a very, very large amount. He says by some 100 months. He makes reference to two things. It would have been an offense level of 30 here, which would have been 97 to 121 months. That would have been the 10 years, et cetera. But he argues that there were two enhancements that moved it from a level 30 to a level 38. The first one was an enhancement for violating the commodities laws of the United States. That one is not very persuasive because she did discuss that one with him. But it's the second one that I want you to help me, if you would, with. Because at no point during the discussion of whether to take a plea did Ms. Van Vliet discuss an additional four-point enhancement under the guidelines for jeopardizing the soundness of a financial institution. She never raised it. Maybe there were good reasons why she didn't, but she did not. And the court actually enhanced four levels on that basis, which would have taken them at least to a level 34. Hold aside the commodities that was discussed. By her own account, Ms. Van Vliet, she never discusses this enhancement. He argues that at least on the Strickland, that was ineffective because if indeed she had flagged this possibility with the other one, then he was looking at a level 38 and then suddenly 10 years in jail might be wholly off as it turned out to be. Was it ineffective counsel for defense lawyer not to discuss the possibility that he would get a four-level enhancement for jeopardizing the soundness of a financial institution, which after all was in the guidelines? No, it was not, your honor. She maintained the entire time that that enhancement should not apply. She did not ever believe that it should apply. She argued against it and the court disagreed. She even maintained her position, obviously recognizing that the court had disagreed, but she maintained that position even years later that it shouldn't have applied. Whether she missed it in advising the defendant about it, of course, is another question. And the record is clear that they did not go over that in advance, that particular four-level enhancement. But the question is whether her guidance, the counsel that she provided is ineffective. And we do not expect our defense attorneys or anyone, any attorney for that matter, to be perfect. When we're looking at whether or not someone was provided effective assistance of to recognize that and advise him, there may have been a mistake, but that does not necessarily equate to complete such a deprivation of information that it rises to the level of ineffective assistance. I think your colleague will come back and say a couple of things. Let me say it for him and have you answer it while we have the opportunity to get your response. He would agree that if we want perfection, we're going to have to find it in the Lord and in church. We're not going to find it in a court of law. And we're not looking for perfection, but we're looking for reasonably effective counsel. And this was a big-ticket item. It was worth four points on this sliding scale, which enhanced the sentence by a substantial number of months. And she didn't so much as pick up on it or flag it for him and say, it's possible but remote and unlikely. It wasn't even on the radar screen for counsel, and so it wasn't on the radar screen for the defendant. That's what he says, and that was ineffective. We don't expect her to say what the judge will do. She can give her best calculation of that, but she doesn't flag it at all. She missed it. It was a mistake, and he says that mistake amounts to ineffectiveness under Strickland. Why is that wrong? Because it happens all the time. There are frequently times where counsel miss certain guidelines that probation ends up applying. It's not uncommon at all, and that is why the court has adopted into its plea colloquy the question to say, or the advice or admonishment to say, you understand that whatever your attorney may have advised you in their best attempt at recognizing what all of the enhancements are and given you an estimate of what the guidelines will be, you recognize that that may not be necessarily correct. They could have made a mistake, and I may apply something else. So the plea colloquy naturally adopts this possible issue and recognizes that it is something that occurs. Thank you. I also wanted to make sure that I mentioned to the court about the billing records because they have been something that Riolo has really latched onto in an attempt to show that certain things were impossible or legally exceedingly improbable about the district court's factual findings. And so there's a lot of talk about whether that May 7th, I'm sorry, the May 11th meeting with McManus, whether she was present for that or not. And he says, well, there's no entry in the billing records for that, and that's true. Now, the government responded that the billing records weren't necessarily, and Ms. Van Vliet testified that the billing records weren't necessarily complete because Mr. Houston, the originating partner, could have written things off. One example that she referenced about that was that certain conversations about the voluntary I don't see any entry in there, and I know I had those conversations. And in his reply, Mr. Riolo pointed out, well, no, there is an entry for that. And that is correct, and I apologize for repeating her error and causing confusion. What I would like the court to be aware of for sure is that that does not mean that the billing records are therefore complete. And I would suggest that because we know that Ms. Van Vliet was at the arraignment, certainly, and there are court records that indicate that she was physically present for that. Yet there is not a billing record by her for attending the arraignment or the initial appearance on June 5th. There is an entry for the paralegal having attended that meeting, but no parallel entry for Ms. Van Vliet. Similarly, there are billing record entries for conferences that happened on February 10th and 11th by the paralegal where she had certain conversations and conferences with Mr. Houston and Ms. Van Vliet, and there are no parallel billing entries by either of them. So there that not everything was accounted for in the billing records. So to say that because there is not an entry for a meeting that Ms. Van Vliet had with someone else, that therefore that didn't occur, there's not the support for that because the billing records are not everything that are simply not fully complete. As far as the allegation that Ms. Van Vliet was out of town, I see that my time has expired. You can finish that one thought quickly and then conclude. Thank you. As far as Ms. Van Vliet being out of town, the record does not establish that she was out of town during that May 11th meeting at the restaurant with Mr. McManus. What it shows is that she was out of town the following day, on May 12th. There is no suggestion that necessarily that meant that she was out of town the previous day when that meeting occurred. So with that, I would ask the court to affirm the district court's denial of Mr. Riolo's 2255. Thank you very much, Ms. Geller. Judge Marcus asked, well, what about the deficient advice on missing the enhancement? And the comeback was, well, it happens all the time and that's why we have colloquies. The it doesn't. Plain and simple. It doesn't cure the bad advice. You're right. You're right about that. But, and Ms. Geller may be exaggerating a bit colloquially when she says it happens all the time, but it does happen. And in this case, reading this from a district court judge's perspective, both sides missed the enhancements. And it's the probation office that came up with the enhancements. And what I think probably happened on the ground, again, I'm not going to rely on my decision on this, but I think what happened from a practitioner's perspective is the defense and the government sort of had an understanding of what the guidelines would be and where they would end up. But the plea agreement doesn't document that. And then the probation office comes up with two enhancements that the parties didn't anticipate. And the government's like, oh, higher sentence, no problem. Sounds good to me. And that's where you go. And that does happen. Maybe not all the time, maybe not often, but it does happen that the probation office and or the court come up with adjustments to the guidelines up or down that the parties did not anticipate. And so going back to Judge Marcus's question, what is it about the alleged deficiency with regard to that enhancement that makes it ineffective assistance of counsel as opposed to the sort of mistake that doesn't cross the line? Well, what happened here is it wasn't even considered. And the record is clear on that. We have the email from her associate, Patsy Zimmerman, that shot back what the initial guidelines calculation was. It's not mentioned in there. I asked Ms. VanVleet. No, I know. I'm to an error concerning the calculation of the guidelines. For example, if you miss a two-level enhancement, does it matter that you're a critical criminal history category four or a two-level makes a huge difference? Does it matter if you're at a criminal history category one and offense level of three or a two-level doesn't make a real difference, maybe just three months in jail? What standard do we create for that sort of error? Here's what the Fifth Circuit said in Herrera. If you miss or underestimate it by 27 months, that's deficient and that's prejudicial. And here, if you look at the way it played out where Riolo got the top end of the guidelines, it was 293. The top end of a level four, I believe, was about 188. So we're over 100 months. That's what the court says in Herrera. This court has cited Herrera favorably in a couple other opinions. One in this case, there's another opinion, Ramirez, where it's cited favorably. So that's what I would say about that. Of course, in Herrera, rather than finding deficiency, the Fifth Circuit simply sent it back to the trial court to hold a hearing to discern what was discussed during the process. This is a case that's been up and down and up and down. And we sent it back and said, hold a hearing, and the judge did it. But let me ask you a question about this failure to flag this four-point enhancement for jeopardizing the soundness of a financial institution. I confess it struck me as it wasn't an obvious one to me, just having looked at the guidelines and having lived with them for a long, long time. And so I went to look at Eleventh Circuit law to see is there any case law discussing the enhancement and what a kind of what would fall into the category of jeopardizing the soundness of a financial institution. There are no Eleventh Circuit cases, as best I can of them, not all, but most of them involve financial institutions, banks, credit unions, and stuff like that. I could find only one court in the Seventh Circuit that actually looked at something where you might have the equivalent of a Ponzi scheme or a sham company itself. And as Judge Jordan points out, the prosecutor missed it too. And third, once it appeared in the probation department's report, Ms. Van Vliet got right on top of it, filed a response and said, Judge, this is wrong. This is not a financial institution. This was something completely different. It was a sham. It was a Ponzi scheme. It was something like that. And when she went in to argue, she vigorously argued as well. Why does all of that amount to Strickland ineffectiveness? I don't think you can say she wasn't ineffective because once she caught her mistake, she went and argued against her mistake. That's after the fact. It's almost like where the government just argued, well, you know, she didn't think it applied, and then she doubled down again on that during the evidentiary hearing. After the fact, there is no post-remedial measures for that. If she had said nothing by way of response to the PSI and said nothing in court, you would walk in here and would be thundering with good conviction, it seems to me. Not only did she miss it on the front end, when it was flagged for her, she still didn't pick it up. But that's not what happened here. Which is actually what seems to me of some moment, although it may not clear up the whole thing, that she did address it and try to convince the judge that whatever else Riolo was doing, he didn't have a financial institution. It wasn't a bank. It wasn't a credit union. It was nothing. It wasn't an investment brokerage house. It was nothing like that. And she failed, and the judge said, okay. And to be honest with you, that's pretty consistent with Mr. Riolo's of what he says, which is, hey, if the court or probation were to go over the guidelines calculation you and the government gave me, then you'd go argue for it, and I'd be okay. Which falls right in line with that. But I don't think you can fix deficiency at that point in time, because it had already occurred. And I think that's where the Herrera case is pretty clear. 27 months. She didn't look into it at all. And I know I'm way after time, but if I could say one more thing. When I get a federal case, because I do a lot of trial work, too, and I go through the guidelines, I don't spend six-tenths of an hour looking at them in a case. I don't care what it is. I'm looking at every one of them, and I'm not just reading the manual to say, oh, this may apply, this may not apply. You have to go hit the books. And yeah, there was a Seventh Circuit opinion on the books that said that this, in a financial sham situation. I think there was also a Fifth Circuit opinion. There was three cases cited by the government in their papers, I think, that convinced Judge Mirabalot to go with it. So, you've got to do more than give six-tenths of an hour on a critical piece of information like this, because when a guy's going into plea, he needs to know from his lawyer reasonably what he's looking at, and what he got is nowhere near what he was looking at. So, with all that said, I would submit that the decision below should be reversed. All right. Thank you both very, very much. We appreciate the help.